UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

         -against-

KWAME ANDERSON,

                     Defendant.

24-CR-009-LTS

### MEMORANDUM ORDER

Kwame Anderson ("Mr. Anderson" or "Defendant") was indicted on January 4, 2024, on a charge of violating 18 U.S.C. Section 922(g)(1), which prohibits individuals previously convicted of a felony from possessing firearms. (Docket entry no. 1 ("Indictment").) Before the Court are two Defense motions: (1) to suppress the evidence seized during Mr. Anderson's arrest (docket entry no. 10 ("Motion to Suppress")): and (2) to dismiss the Indictment (docket entry no. 13 ("MTD")). The Government opposes both motions.

The Court has considered the various submissions of the Parties carefully and, for the following reasons, denies both of Defendant's motions.

### BACKGROUND

The following factual summary is drawn from the parties' written submissions and body camera footage.[1]

---

[1] The Defendant proffered a declaration and made factual assertions in connection with the suppression motion based on police statements and body camera footage, contending that the suppression motion should be granted based on that body of information or that an evidentiary hearing should be held as to any disputes of material fact. The Government undertook to rely on on "the same factual record" and did not request an evidentiary hearing to determine contested issues of material fact. (Docket entry nos. 16, 17.) The Court has not conducted an evidentiary hearing, having determined, as explained below, that there are no genuine disputes as to material issues of fact.

In 2015, Mr. Anderson was convicted of the felony offense of brandishing a firearm in connection with a drug-trafficking conspiracy, in violation of 18 U.S.C. Section 924(c).

On July 5, 2023, Police Officers Wesler, McCabe, Medina, and Vargas (the "Officers") were patrolling Mr. Anderson's neighborhood in an unmarked car. The Officers' assignment that night was to "canvas[] '[h]igh crime areas.'" (Docket entry no. 20 ("Gov. Mem.") at 9.) Officer McCabe reported that he frequently canvassed Mr. Anderson's neighborhood and that there had been shootings in the area in the past. (Id.) Officer Wesler proffered that he goes to the area "a few times a week" and that the area around Mr. Anderson's street has occasional shootings. (Id.)

Around 2:00 a.m., the Officers saw Mr. Anderson on the street outside of his apartment building, 1925 Harrison Avenue. Mr. Anderson was standing in front of a building and was visible from the Officers' vantage point on the street, which was well lit by streetlamps and lights on the buildings. (Gov. Ex. A ("Wesler Body Cam.").) The Officers stopped the car and observed Mr. Anderson from the car, which was approximately ten yards away from Mr. Anderson, for approximately fifteen seconds. (Docket entry no. 12 ("Def. Mem.") at 2; Gov. Mem. at 3.) All four Officers have proffered testimony to the effect that they observed that Mr. Anderson was wearing a black cross-body bag that appeared to be "weighed down," by something "consistent with the size of [a] firearm." (Def. Mem. at 3; Gov. Mem. at 2.) Mr. Anderson acknowledges that he was wearing a black cross-body bag but denies that he had "a weapon or any contraband in plain view." (Docket entry no. 11 ("Anderson Decl.") ¶ 2.)

Officer Wesler exited the back seat of the vehicle and approached Mr. Anderson. (Wesler Body Cam.) He shone his flashlight toward Mr. Anderson and said, "Sup bro?" but did

not verbally identify himself as a Police Officer. (Id.) Immediately, Mr. Anderson took flight from the Officers, the rest of whom were emerging from the unmarked vehicle, and entered the apartment building. (Id.) Officers Wesler, Medina, and Vargas were wearing dark-colored Neighborhood Safety Team ("NST") uniforms, which displayed the word "POLICE" in white lettering on the upper right chest area, a light-colored shield on the upper left chest area above a patch with the officer's name and badge number in white lettering, and the words "NYPD POLICE" across the back. (Def. Mem. at 2; see also Wesler Body Cam; Gov. Ex. B ("McCabe Body Cam"); Gov. Ex. D ("Vargas Body Cam.").) Officer Medina wore a standard NYPD uniform. (Def. Mem. at 2; Gov. Ex. C ("Medina Body Cam.").) All four wore belts with walkie talkies, handcuffs and other police equipment attached. Mr. Anderson states that he did not perceive that they were police officers. (Anderson Decl. ¶ 4.)

Officer Wesler, followed by the others, pursued Mr. Anderson inside the building, up a flight of stairs, and down a long hallway, instructing the Defendant to stop fleeing. (Wesler Body Cam.) As Mr. Anderson ran down the hallway, he grabbed the cross-body bag, pulling it over his head and into his hands in front of his body, where the bag was no longer visible from Officer Wesler's vantage point. (Id.) Officer Wesler then shoved the Defendant from behind, pushing him toward a door at the end of the hallway; the Defendant hit the door and dropped the cross-body bag before briefly reeling back toward the Officer. (Id.) At that time, Officers Wesler and McCabe reached Mr. Anderson and shoved him to the floor, at which point Officers Medina and Vargas struck Mr. Anderson, grabbed at his hands, which he had covering his face and head, and repeatedly said, "Give me your hands." (Id.; see also Medina Body Cam; McCabe Body Cam.) While Mr. Anderson was being subdued, Officer McCabe searched the cross-body bag and, upon finding that it contained a gun, alerted the other Officers. (McCabe Body Cam.)

Officer Vargas handcuffed Mr. Anderson and placed him under arrest. (Vargas Body Cam.) Mr. Anderson's bag in fact contained a black plastic bag with a firearm, magazine, and ammunition inside it. (Def. Mem. at 3.)

On January 4, 2024, Mr. Anderson was indicted for possessing a firearm after having been previously convicted of a felony, in violation of 18 U.S.C. Section 922(g). (Indictment.) On February 9, 2024, the Defense filed the instant motions challenging the admissibility of evidence seized during Mr. Anderson's arrest, as well as the constitutionality of the statute under which Mr. Anderson is charged in the Indictment.

## Discussion

*Motion to Suppress*

To defeat a suppression motion, the Government must establish that the challenged search was constitutional, "by a preponderance of the evidence." United States v. Matlock, 415 U.S. 164, 177 n. 14 (1974).

### *Evidentiary hearing*

"[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." United States v. Pena, 961 F.2d 333, 339 (2d Cir. 1992) (internal citation omitted). Still, "without specification of the factual basis" that supports suppression, "the district court is not required to have a hearing." United States v. Mathurin, 148 F.3d 68, 69 (2d Cir. 1998); see also United States v. Viscioso, 711 F. Supp. 740, 745 (S.D.N.Y. 1989) ("A hearing is not required if

the defendant's statements are general, conclusory or based on conjecture."). A defendant "bears the initial burden of establishing, by an affidavit of someone with personal knowledge of the underlying facts, that there are, in fact, disputed issues of material facts." United States v. Dixon, No. 20-CR-368-NSR, 2021 WL 106419, at *4 (S.D.N.Y. Jan. 12, 2021) (citation omitted).

In his Reply Memorandum, the Defendant asserts that an evidentiary hearing is required as to five contested facts. (Docket entry no. 24 ("Def. Reply") at 6-7.) Of the contested facts identified, only two are material to the Court's analysis — "whether the officers were able to make any sort of credible observation about the contents of Mr. Anderson's bag, at night, from a significant distance, in a matter of seconds," and "whether the officers could have reasonably believed that Mr. Anderson recognized them as police, particularly because the first two officers in pursuit were wearing NST uniforms."[2] (Id. at 6.) The Defense has failed, however, to proffer any specific factual basis in the affidavit of Kwame Anderson to show that these facts are genuinely in dispute.

Both identified issues require the Court to draw reasonable conclusions from its analysis of the facts and circumstances present at the time the Officers observed Mr. Anderson and approached him, as shown by the evidence of record. Mr. Anderson's brief declaration asserts, in material part, that he was standing against a wall outside of his building displaying no weapon or contraband, that there was a car parked between him and the driving lane, and that he did not recognize the Officers as police. (Anderson Decl. ¶¶ 2, 4.) While he asserts that the

---

[2] The other "contested issues of fact" the Defense identifies are not material, even if the Court were to credit the Defense's proffer of a factual basis for a genuine dispute. Those issues comprise: "whether Officer Wesler slammed Mr. Anderson's head into a door by shoving him, or whether Mr. Anderson merely 'made contact' with the door"; "whether Mr. Anderson 'came back towards' the officers and struggled with them, or if he simply reeled from hitting his head and attempted to protect himself from further harm"; and "whether Mr. Anderson's arrest occurred in a high-crime area."

Officers' accounts of perceiving Mr. Anderson's cross-body bag as weighed down are not credible, he does not identify any specific facts, or inconsistencies in their accounts, that raise a genuine dispute as to their credibility.  Mr. Anderson's contrary but conclusory assertions alone do not justify a suppression hearing.  <u>Viscioso</u>, 711 F. Supp. at 745.  Nor does his assertion that he did not perceive the people approaching him as police officers raise a genuine disputed issue of fact, because the relevant question as to the reasonableness of the Officers' actions is, as explained below, whether the Officers had a reasonable basis for believing that the Defendant would have recognized them as police officers.  Here, the white labeling on the front of their uniforms, their police equipment belts, and the lighting from streetlights, building lights and nearby stationary cars, supplied ample basis for such a belief on the part of the Officers.

    Mr. Anderson's affidavit does not dispute any of the underlying objective facts that informed the Officers' perception of the events.  (<u>See</u> Anderson Decl.)  By contrast, in <u>Dixon</u>, 2021 WL 106419, at *2, which Mr. Anderson cites in support of his argument that an evidentiary hearing is warranted, the defendant had pointed to specific, articulable disputes over the factual events that occurred in the lead up to his search — namely, whether the defendant was "nervously" adjusting and concealing a bag when he notice police officers nearby.  <u>Id.</u> at *7.  Here, no such material contradiction is presented by the evidence of record.  Therefore, the Court makes its determination on the Motion to Suppress on basis of the Parties' submissions and the Court's own review of the camera footage.

    <u>*Constitutionality of the Search*</u>

    Mr. Anderson argues that he was subjected to an unconstitutional arrest without probable cause when Officer Wesler pushed him in the hallway.  (Def. Mem. at 4.)  The

Government contends that the push was in aid of a legal investigative stop, and that no arrest was made until after probable cause had emerged with the discovery of the gun in the cross-body bag. (Gov. Mem. at 12-13.)  The Court first considers whether the actions by the Officers were consistent with an investigative stop.

Police officers may institute a brief investigative Terry[3] stop of an individual if they have a "reasonable suspicion that a person may be involved in criminal activity."  Hiibel v. Sixth Jud. Dist. Ct. of Nev., 542 U.S. 177, 185 (2004).  "In the course of a Terry stop, police officers may conduct a limited frisk for weapons if the officers have a reasonable suspicion that the suspect is 'armed and dangerous.'"  United States v. Torres, 252 F. Supp. 3d 229, 232 (S.D.N.Y. 2017) (quoting Arizona v. Johnson, 555 U.S. 323, 326-27 (2009)).  A Terry stop must be limited, however, and can "ripen[] into an arrest, which must be supported by probable cause," if officers "unreasonably" use means of detention that are "more intrusive than necessary."  United States v. Perea, 986 F.2d 633, 644 (2d Cir. 1993).

Defendant advances two arguments in the alternative.  First, Mr. Anderson asserts that the Officers' Terry stop ripened into an arrest — which required, and lacked, probable cause — when Officer Wesler shoved Mr. Anderson.  (Def. Mem. at 4.)  Second, Defendant argues that, even if the search was conducted as part of a Terry stop, Officers lacked reasonable suspicion to support the stop.  (Id. at 9.)  The Court addresses the two arguments in turn.

*Terry Stop or Arrest?*

In determining whether the Officers' effectuation of a Terry stop ripened the stop into an arrest, courts are to consider the "amount of force used by the police, the need for such force, the extent to which an individual's freedom of movement was restrained and, in particular,

---

[3]     See Terry v. Ohio, 392 U.S. 1 (1968).

such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used." Perea, 986 F.2d at 645 (collecting cases).  Even "intrusive and aggressive conduct" may not constitute an arrest when the conduct "is a reasonable response to legitimate safety concerns on the part of investigating officers." United States v. Vargas, 369 F.3d 98, 102 (2d Cir. 2004) (citing United States v. Miles, 247 F.3d 1009, 1012 (9th Cir. 2001)).

The Defense asserts that Officers Wesler and McCabe used "intrusive and aggressive conduct" to detain Mr. Anderson by shoving the Defendant to arrest his flight, pushing him to the ground, and striking him while he was on the ground.  (Def. Mem. at 5.)  The Court, having observed the body camera footage, finds that these actions, while intrusive, were reasonable under the full circumstances.  First, Officer Wesler's decision to shove Mr. Anderson during his flight was minimally intrusive and was reasonably calibrated to stop Mr. Anderson's headlong flight from police officers.[4]  No alternative, less intrusive method that Officer Wesler, who had pursued and shouted repeatedly at Mr. Anderson to stop, could have used safely to halt

---

[4] The Defense argues that Mr. Anderson's flight was not intended to evade questioning by police because Mr. Anderson did not know he was being chased by police officers and merely feared for his own safety because strangers were accosting him at night.  (Def. Mem. at 9.)  This argument is not material to the Court's analysis of the reasonableness of the shove and subsequent immobilization of the Defendant because the Court must assess the reasonableness of a seizure from the perspective of a reasonable police officer.  See Graham v. M.S. Connor, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene . . ." (citing Terry, 392 U.S. at 20-22)).  Although Officer Wesler did not verbally identify himself as a police officer, he approached Mr. Anderson in a well-lit area and was wearing a police uniform with a shield, his identification, and the word "POLICE" emblazoned on the front, as well as a belt adorned with law enforcement equipment.  The Court finds that a reasonable officer in his position would have believed that Mr. Anderson knew he was being approached by police.

Mr. Anderson's flight is proffered by the defense or is otherwise apparent.[5]  (See Def. Mem.; Wesler Body Cam.)  Additionally, no Officer made physical contact with Mr. Anderson until after he had fled up two flights of stairs, down a hallway, and then pulled his cross-body bag over his head and into his hands in front of his body, where it could not be seen by the pursuers. (Wesler Body Cam.)  On the basis of the Officers' statements that they believed that the bag may have contained a weapon (Def. Mem. at 3) and with the Defendant's subsequent flight from police and concealment of the bag, the Court finds that — from the perspectives of Officers Wesler and McCabe — Mr. Anderson's perceived attempt to access the contents of the bag would reasonably have heightened their safety concerns during the incident.[6]  Finally, the length of Mr. Anderson's detention prior to the discovery of the gun and ammunition in the bag — which the Defense does not dispute provided probable cause for an arrest — was minimal.  See Vargas, 369 F.3d at 101-102 (finding that a Terry stop did not ripen into an arrest, despite police placing the suspect on the ground in handcuffs, because the officers had "reliable information [that the suspect] was carrying a weapon," the suspect had demonstrated unwillingness to cooperate by fleeing, and the detention was very brief).

---

[5] The Defense asserts that, at the time of the shove, Officer Wesler "very nearly had [Mr. Anderson] cornered." (Def Mem. at 5.)  This assertion is contradicted by the clear evidence on the body camera footage that Mr. Anderson was near another flight of stairs when Officer Wesler pushed him forward.  (See Wesler Body Cam.)

[6] The Defense has argued that the contents of the cross-body bag were accessible without Mr. Anderson needing to remove the strap from around his body and hold the bag in his hands.  (Def. Reply at 3.)  The Defense reasons that, when Defendant grabbed the bag, the Officers "could, at worst, only assume that Mr. Anderson was attempting to abandon [it]." (Id.)  This argument is unpersuasive.  Again, the Court is bound to interpret the reasonableness of the seizure from the Officers' perspectives.  Running headlong down the hallway, Mr. Anderson might well have needed to hold the bag in his hands to unzipper it and access its contents.  With their view of the bag obscured (Gov. Mem. at 12; Def. Reply at 3), the Officers could not have ascertained whether Mr. Anderson had been able to retrieve a weapon from the bag had they not effectuated the stop at that time.

For these reasons, the Court finds that the Officers' conduct — while more aggressive than a typical <u>Terry</u> stop — constituted a reasonable use of force given the totality of the circumstances and did not constitute an arrest.  Therefore, Mr. Anderson's seizure was a stop, and did not become an arrest until after the discovery of the firearm in the bag that he had dropped onto the floor near him after he was shoved.

*Reasonable Suspicion*

The Court next turns to the question of whether the <u>Terry</u> stop was properly supported by reasonable suspicion that Mr. Anderson was involved in criminal activity.  A <u>Terry</u> stop is permissible under the Fourth Amendment where the police possess "facts sufficient to give rise to a reasonable suspicion that criminal activity 'may be afoot' and that the person stopped '<u>may</u> be armed and presently dangerous.'"  <u>United States v. Bailey</u>, 743 F.3d 322, 332 (2d Cir. 2014) (quoting <u>Terry</u>, 392 U.S. at 30) (emphasis in original).  Courts must "look at the totality of the circumstances' in order to determine 'whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.'"  <u>United States v. Freeman</u>, 735 F.3d 92, 101 (2d Cir. 2013) (quoting <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002)).  While Officers "may not rely on an 'inchoate and unparticularized suspicion' . . . [they] are 'entitled to draw on [their] own experience and specialized training to make inferences from and deductions about the cumulative information available to [them.]'"  <u>United States v. Padilla</u>, 548 F.3d 179, 187 (2d Cir. 2008) (internal citations omitted).  Ultimately, "[the] amount of suspicion needed to justify the encounter is less than a 'fair probability' of wrongdoing, and 'considerably less than proof of wrongdoing by a preponderance of evidence.'"  <u>Id.</u> at 186-87 (quoting <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989)).  The Government argues that Officers Wesler and

McCabe had reasonable suspicion to conduct a Terry stop at the time of Mr. Anderson's seizure, which occurred when he was shoved.

The Officers have proffered statements that they were motivated to initiate the stop given their observations that Mr. Anderson's bag appeared "weighed down" as though it could contain a weapon. The uncontested factual record shows that the Officers observed Mr. Anderson outside his building at 2:00 a.m. for approximately 15 seconds while about 10 yards away. During this time, Mr. Anderson was standing in a well-lit area. (See Wesler Body Cam.) The Court need not opine on whether Officer Wesler had reasonable suspicion to search Mr. Anderson merely from his observations of the bag at the time he exited the vehicle, because those suspicions were heightened by Mr. Anderson's subsequent flight from the uniformed officers.

As the Government argues, Mr. Anderson's flight provides a significant basis for the Officers' suspicion, given that "[h]eadlong flight — wherever it occurs — is the consummate act of evasion." United States v. Bell, 733 F. App'x 20, 22 (2d Cir. 2018) (quoting Illinois v. Wardlow, 528 U.S. 119, 124 (2000)). While "flight from the police alone may not create reasonable suspicion," "evasive behavior is a pertinent factor" in determining whether a Terry stop was warranted. Id. at 22. The Defense argues that Mr. Anderson's flight could not provide a basis for finding reasonable suspicion because facts in the record support a finding that the area was not a "high crime area." (Def. Mem. at 8-9.) While the existence of reasonable suspicion would arguably have been even clearer had this encounter taken place in a high-crime area, see United States v. Muhammad, 463 F.3d 115, 121 (2d Cir. 2006), a high crime location is not an essential predicate for a finding that a suspect's flight in an effort to avoid a police encounter demonstrated "evasive behavior" contributing to a finding of reasonable suspicion. See

Wardlow, 528 U.S. at 124 (finding that flight from police, wherever it occurs, "is not necessarily indicative of wrongdoing, but . . . is certainly suggestive of such").  Therefore, even if Mr. Anderson's neighborhood was not a "high crime area," his flight — taken with other contextual considerations — can still provide a basis for reasonable suspicion.  As Judge Lohier noted in his concurrence in United States v. Weaver, 9 F.4th 129, 155-56 (2d Cir. 2021), "high crime area" is a poorly defined term in our case law.  The evidence cited by the Parties shows that Officers Wesler and McCabe knew the area as one in which shootings had occurred, patrolled it regularly, and that the Officers' assignment on the night of the incident included canvassing "high crime[] areas."  (See Gov. Mem. at 9.)  Additionally, the Officers' statements indicate that the "crimes that frequently occur in the area [i.e., the shootings,] are specific and related to the reason for which [Mr. Anderson] was stopped."  See Weaver, 9 F.4th at 158 (Lohier, J., concurring) (quoting United States v. Caruthers, 458 F.3d 459, 468 (6th Cir. 2006)).  Standing alone, these facts might not have been sufficient for Mr. Anderson's flight to provide reasonable suspicion, but the Court need not opine on this counterfactual, either.  The chase was precipitated and informed by the Officers' previous observations of Mr. Anderson's bag.  Then, the Officers' suspicion was reasonably heightened when Mr. Anderson pulled the bag over his head and placed it in front of his body, out of the Officers' sight, appearing to either attempt to access a weapon, or — as the Defense suggests — to abandon evidence of wrongdoing.  Taken together, the Court finds that these circumstances provide a "particularized basis" sufficient to satisfy the "lenient" standard for reasonable suspicion of criminal activity.  United States v. Oates, 560 F.2d 45, 63 (2d Cir. 1977).

       For these reasons, Defendant's motion to suppress the seized evidence is denied.

*Bruen* Motion

The Defendant, alternatively, moves to dismiss the Indictment, arguing that the underlying criminal statute, 18 U.S.C. Section 922(g)(1), which criminalizes the possession of firearms by a person who has previously been convicted of a felony, is unconstitutional in light of the Supreme Court's holding in Bruen v. N.Y.S. Rifle & Pistol Assoc., 597 U.S. 1 (2022). (Bruen Motion; see also docket entry no. 14 ("Def. Bruen Mem.") at 1.)  The Court finds this argument unpersuasive, and the motion is denied, for the following reasons.

In Bruen, the Supreme Court clarified the analysis courts must use when determining the constitutionality of state regulations that place a burden on the "longstanding, recognized" constitutional right to gun ownership.  597 U.S. at 24.  Extending a line of case law beginning with District of Columbia v. Heller, 554 U.S. 570 (2008) and McDonald v. City of Chicago, 561 U.S. 742 (2010), the Supreme Court explicitly rejected the oft-used "means-ends" test for constitutionality with respect to laws infringing upon citizens' Second Amendment rights. Bruen, 597 U.S. at 19.  Instead, courts are directed to use a two-step analysis to evaluate such claims.  First, the Court must determine whether the challenged law imposes a burden on the recognized right to armed self-defense.  If so, the Court must then determine whether the modern burden is justified by a rationale comparable to regulations that were imposed historically on the right to armed self-defense, such that the restriction would have been recognized as valid around the time of the enactment of the Amendment.  Id. at 24.

Critically, however, Bruen itself recognizes the right protected by the Second Amendment as one pertaining to firearms possession and use by "ordinary, law-abiding citizen[s]."  597 U.S. at 9.  In both Heller and McDonald, which the Bruen Court reaffirmed, the Supreme Court stated that nothing in the recent developments of the Supreme Court's Second

Amendment jurisprudence should be "taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." Heller, 554 U.S. at 626; see also McDonald, 561 U.S. at 786 ("We made it clear in Heller that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions of firearms by felons' . . . . We repeat those reassurances here."). Additionally, prior to Bruen, the Second Circuit, whose decisions are binding on this Court, considered and upheld the constitutionality of Section 922(g) under the precedent of Heller and McDonald. United States v. Bogle, 717 F.3d 281, 281 (2d Cir. 2013). Nothing in Bruen invalidated the reasoning the Second Circuit employed in Bogle, and this Court remains bound by that precedent.

    Defendants argue that, because no provision prohibiting violent felons from bearing arms was enacted in U.S. law until the Federal Firearms Act of 1938, a Bruen analysis compels the conclusion that Section 922(g) imposes a burden unsupported by history. (Def. Mem. at 6.) The Bruen Court made clear, however, that historical analogies can be sound even if the modern regulation is not a "dead ringer" to historical precursors. 597 U.S. at 30. The Court is satisfied that English, colonial, and early Republic history reflect a "longstanding" tradition of the state limiting the right of groups considered to be dangerous to society, including persons who have been convicted of serious crimes, to bear arms. Such historic post-conviction limitations on violent felony offenders' freedoms included pervasive death penalty provisions and severe limitations on civil rights. (See, e.g., authorities cited in docket entry no. 25 ("Gov. Bruen Mem.") at 17-24.) Unlike many historic restrictions on the right to bear arms, in which the state stripped marginalized groups (e.g., Catholics, non-white persons) of rights in order to protect against challenges to the established social order, the prohibitions on violent felony offenders' freedom, including access to firearms, reflected objectively logical concerns that such

offenders might pose a danger to society if given further access to firearms.  Indeed, the <u>Heller</u> and <u>McDonald</u> majority opinions, and the concurrences by Justices Alito and Kavanaugh in <u>Bruen</u>, disclaim any intention to disturb long-standing prohibitions on felony offenders' ability to bear arms.  <u>Bruen</u>, 597 U.S. at 80-81 (Kavanaugh, J., concurring); <u>see also</u> <u>Bruen</u>, 597 U.S. at 72 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm . . . Nor have we disturbed anything we said in <u>Heller</u> or <u>McDonald</u> about restrictions that may be imposed on the possession or carrying of guns.").  The Court therefore concurs with every other court in this District that has considered this issue in finding that that Section 922(g) is constitutional in light of <u>Bruen</u>.  <u>See</u>, <u>e.g.</u>, <u>United States v. Abreu</u>, No. 23-CR-067-NSR, 2023 WL 6541302 (S.D.N.Y. Oct. 6, 2023); <u>United States v. Barnes</u>, No. 22-CR-043-JPO, 2023 WL 2268129 (S.D.N.Y. Feb. 28, 2023); <u>United States v. King</u>, 634 F. Supp. 3d 76, 83 (S.D.N.Y. 2022).

## CONCLUSION

For the foregoing reasons, Defendant's motions to suppress evidence and to dismiss the Indictment are hereby denied.  This Memorandum Order resolves docket entry nos. 10 and 13.

SO ORDERED.

Dated: New York, New York
May 28, 2024

      /s/ Laura Taylor Swain
     LAURA TAYLOR SWAIN
     Chief United States District Judge